Ruth G. Ginsburg, Appellee, v. Frederick H. Bartlett, as Trustee for Frederick H. Bartlett Realty Company, Appellant.

### Gen. No. 34,613.

16

Opinion filed May 19, 1931. Rehearing denied June 1, 1931.

FOREMAN, BLUFORD, KRINSLEY & SCHULTZ, for appellant; RAYMOND H. SCHULTZ, VICTOR J. VOORHEIS, HUBERT VAN HOOK and OWEN RALL, of counsel.

KESSLER, TOBIN & MILLER, for appellee; HARRY TOBIN and LEON N. MILLER, of counsel.

MR. JUSTICE GRIDLEY delivered the opinion of the court.

On May 23, 1928, plaintiff commenced an action in case against defendant, claiming damages for fraud and deceit in inducing her to contract for the purchase of, and partially pay for, two parcels of land in Lake county, Illinois. In May, 1930, after a trial before a jury, a verdict was returned finding defendant guilty and assessing plaintiff's damages at $9,000. Judgment for that sum was entered against defendant and the present appeal followed.

The case was tried on count one and count two (as amended) in plaintiff's fourth amended declaration, to which defendant filed pleas of not guilty. In count one plaintiff averred in substance that on and prior to September 1, 1925, the defendant, Frederick H. Bartlett, as trustee for Frederick H. Bartlett Realty Company, was engaged in the real estate subdivision business in Chicago, Illinois, and possessed, owned and offered for sale lots or parcels of land located in Bartlett's "Grand Estates" subdivision and in Frederick H. Bartlett's "North Shore Highlands" subdivision, in Lake county, Illinois; that defendant, by his agent or agents, applied to plaintiff for the purpose of selling to her certain lots or parcels of land in the subdivisions; that for the purpose of inducing her to part with her money, defendant, by his agent or agents, falsely and fraudulently represented and stated to her that "railroad transportation facilities were then being established," that "a railroad company was the owner of the right of way adjoining the subdivisions," and that "a contract *had been entered into* between the railroad company and the defendant herein, wherein and whereby the railroad company did agree that within a short period of time complete railroad transportation would be maintained upon the tracks *then being laid*"; that said subdivisions then were and now are located a long distance from any established railroad transportation facilities, and for that reason are of small and questionable value; that upon the faith of the representations and statements so made, and relying implicitly upon them and believing them to be true, plaintiff selected and contracted to purchase two parcels in the subdivisions; that one of them had a frontage on Green Bay road on the east and Glen Flora avenue on the south, and was located in said "North Shore Highlands" subdivision, and of which the purchase price was $5,750; that the other lot was

described as W ½ of Block one (1) in said "Grand Estates" subdivision, and of which the purchase price was $7,250; and that upon the purchase price of the *two* parcels plaintiff has paid to defendant, through his agent or agents, the sum of $5,825. And plaintiff further averred that the representations and statements, so made by defendant by his agent or agents relative to the establishment of railroad transportation facilities and to his contract with the railroad company as aforesaid, "were each and all of them utterly false and untrue at the time they were made, and were at that time known by defendant, his agent or agents, to be false and untrue"; that the same were made by defendant, his agent or agents, "with a fraudulent purpose of ensnaring plaintiff into a trap and mulcting her of her money"; and that at the time defendant, his agent or agents, "knew that no railroad transportation facilities were then being established, and that no contract had been entered into between defendant and the railroad company or companies, wherein or whereby it or they had agreed to establish and maintain railroad transportation to the aforesaid subdivisions," and plaintiff further averred that "to this date no such railroad facilities have been established."

The gist of amended count two is that, of the two lots selected by her, one faced east on Green Bay road and south on Glen Flora avenue (northwest corner) and that *the lot agreed to be conveyed* is not the lot selected by her, in that it faces Green Bay road on the *west* and Glen Flora avenue on the south (northeast corner).

On the trial plaintiff testified that on Sunday, September 13, 1925, at the solicitation of Ida Rappeport, an employee of the Frederick H. Bartlett Realty Co. (not incorporated and hereinafter called the Realty Co.), she, her husband and daughter and Miss Rappeport went together by train to Waukegan, and from

there by omnibus to a "sales pavilion" of the Realty Co. on one of defendant's said subdivisions; that one James H. Cline was introduced by Miss Rappeport as "her manager"; that Cline stated that his employer had been selling real estate in Chicago and vicinity for over 30 years, that everybody that had bought real estate from the Realty Co. had made money, that lots in the subdivisions were valuable, and that there were two especially valuable lots—one at the northwest corner of Glen Flora avenue and Green Bay road and the other at a corresponding corner a little farther to the north; that, at his request, Miss Rappeport and the witness, her husband and daughter, walked a short distance away from the pavilion and Miss Rappeport pointed out a particular corner lot which she said was the one first referred to by Cline, being on the west side of Green Bay road, which was a paved road and a State highway; that upon the witness asking what transportation facilities the subdivision had or was to have, the party, at Miss Rappeport's suggestion, walked about four or five blocks to the east where she "showed some stanchions all completed"; that she then stated that "railroad tracks were then being laid," that "the men were laying them about a mile farther south," that "Frederick H. Bartlett had entered into a contract with the railroad company that it would supply complete transportation to this subdivision . . . within the next six months," and that "there would be a station at Grand avenue and the railroad right of way" (Grand avenue was a paved east and west State highway south of Glen Flora avenue, an improved east and west street); that at the time Miss Rappeport made these statements the witness viewed the surrounding country and observed that these stanchions were in a north and south line with wires on some of them, that they were a few blocks east of Green Bay road, that the land immediately south of

Glen Flora avenue was fenced in, that there were cows on the land, and that there were no buildings except the pavilion on the subdivision; that after returning to the pavilion Cline again joined them and repeated his statements regarding the value of said two northwest corner lots; that he further stated that they would be "very valuable on account of the railroad being built there, would undoubtedly double in value when the railroad was completed," and that "they had an agreement with the railroad company that it would supply complete transportation to this subdivision within six months"; that he further stated that the price of the lot at the northwest corner of Glen Flora avenue and Green Bay road was $5,750 and that the price of the other northwest corner, a little farther to the north, was $3,975; that he shortly thereafter presented her with two contracts, with duplicate originals, and requested her to sign them; that she at first refused, saying that she wanted to submit them to her attorney; that he kept urging her to sign them; and that after she had examined them and had had further conversation with him (hereinafter mentioned) she signed and delivered them.

These contracts, introduced in evidence, are on printed forms, each bearing date September 12, 1925, and signed and sealed by "Frederick H. Bartlett, Trustee as aforesaid" and "Ruth G. Ginsburg." In the first one it is recited that the contract is between "Frederick H. Bartlett, as trustee for Fred'k H. Bartlett Realty Co. (not inc.), hereinafter called the Vendor, and Ruth G. Ginsburg, 2043 Pierce avenue, Chicago, hereinafter called the Purchaser"; and it is provided that if the purchaser shall first make the payments and perform the covenants therein provided to be made and performed by her, the vendor will convey "by a good and sufficient trustee's deed" to her in fee simple "Lot Four (4) in Block Twenty-Four (24) in

Frederick H. Bartlett's North Shore Highlands subdivision," etc. And the purchaser covenants and agrees to pay to the vendor, "at the office of Fred'k H. Bartlett Realty Co. (not inc.), in Chicago," the sum of $3,975,—"$795 dollars, cash, receipt of which is acknowledged, and the balance, $3,180, in monthly instalments of $50, or more, on the 12th day of each and every month hereafter, commencing October 12, 1925, until 45 months from date hereof, at which time the entire unpaid balance of said purchase price shall become due and payable." Then follow in small printed type various covenants and provisions, the last one, just above the signatures of the parties, being as follows:

"Purchaser further agrees that the vendor *has not represented or promised that there will be a new line of transportation to North Shore Highlands,* notwithstanding the fact that it is generally understood that a public service corporation is the owner of a right of way through the said subdivision, it being now stated by the vendor that there may never be a new line of transportation on said right of way, and it is further agreed that a new line of transportation is not a part of the consideration of this contract."

Immediately to the left of the signatures of the parties, and above another signature of Ruth G. Ginsburg, is the following clause (called by defendant's counsel and hereinafter referred to as the "subjoined" clause) in smaller printed type:

"The undersigned purchaser has read and understands the whole of the above contract, and, in consideration of the sale and vendor affixing his signature, *expressly agrees that no misrepresentations regarding the property have been made to him by any vendor's agents or salesmen,* and *releases any right or claim* he might have by reason of any misrepresentation if made by any such agent or salesman, and expressly

states that no representation, promise or agreement not expressed in the contract has been made to induce him to enter into it.''

The other contract is on a similar printed form, bearing the same date. The property mentioned therein is "Lot Seven (7) in Block Twenty-one (21)" in said North Shore Highlands subdivision. And the purchaser (plaintiff) agrees to pay to the vendor "$5,750,—$1,150 cash, receipt of which is hereby acknowledged, and the balance $4,600 in monthly instalments of $75, or more, on the 12th day of each and every month thereafter, commencing October 12, 1925, until 45 months from date hereof at which time the entire unpaid balance of said purchase price shall become due and payable.'' There are the same provisions and the same "subjoined" clause, signed by plaintiff.

Plaintiff further testified that when Cline kept urging her to sign the contracts he said to her "they are just the ordinary contracts; there is nothing in them that could do you any harm''; that after examination of them she noticed the clause to the effect that the vendor had not represented that there would be any new railroad transportation to the subdivision, etc.; that she said to Cline: "There is a clause in here that you do not promise any railroad, and you distinctly told me just now that the railroad would be completed before six months and that you had a contract with the railroad company and that complete transportation would be supplied for this subdivision''; that Cline replied: "You do not have to worry about that, these contracts were printed long before the railroad company was laying the tracks; as it is putting in the tracks you do not have to worry; that clause won't do you any harm''; that upon her asking him where the railroad was to run he showed her a map (introduced in evidence) as to the locations of the two subdivisions,

etc., pointed to a pencil line, which he had made on the map, and said "this is the right of way" (a sketch of this map is in the abstract); that he also made a red mark on the map, showing where the northwest corner lot of Green Bay road and Glen Flora avenue is located; that he further said that the pencil line on the map indicated "the right of way where the men were laying the tracks then"; that relying on these statements of Cline she signed the contracts (each in duplicate); that the aggregate amount of the two required cash payments was $1,945; and that, upon Cline's request, a check for the amount was given to him, dated September 14, 1925, drawn on Foreman National Bank, payable to order of the Realty Co. The check was subsequently cashed by the Realty Co.

Plaintiff's daughter, Myra (13 years old at time of the trial), corroborated plaintiff as to the above happenings, and especially as to the representations of Miss Rappeport and Cline as to the railroad transportation facilities to the subdivisions and Cline's other statements. Cline, who testified that he was the "Sales manager" of the Realty Co., denied making any such statements or representations as testified to by plaintiff or her daughter. Miss Rappeport was not called as a witness.

Plaintiff further testified that on Tuesday, September 15, she telephoned Cline that it was not possible for her to pay for *two* parcels of land; that on the following Sunday, September 20, she, her husband and Miss Rappeport again went to the subdivision and met Cline; that after she had stated her financial inability to buy the *two* parcels he said: "There is a piece of property which has been turned back to the Realty Co. on Grand avenue (west half of block 1 in Grand Estates subdivision); if you will take that, I will take back the smaller of the two lots you have agreed to purchase, and I will so arrange it that you will not

have to pay for this Grand avenue property for six months and before that the railroad will be built, and we will in the meantime sell this northwest corner of Green Bay road and Glen Flora avenue for you''; that the smaller lot referred to by Cline was the one which she had agreed to purchase for $3,975, and had paid on account $795; that thereupon the witness and Miss Rappeport went in an automobile and the latter pointed out said west half of block 1, which was just north of Grand avenue and west of Green Bay road; that upon the return to the pavilion Cline further said that this parcel of land was valuable because the railroad would be completed within six months and they would have a station on Grand avenue, that if the witness could be induced to buy it he would make the price $7,250 (with a deduction of $250, making the net price $7,000) and would take back the $3,975 lot, that he would also see to it that the witness would not be required to make any monthly payments for six months, and that by that time ''we will have this Green Bay road and Glen Flora avenue corner sold for you and you will have enough money with which to pay for the Grand avenue property (W½ of block 1)''; that the witness, relying upon Cline's statements and promises, accepted the proposition; and that thereupon Cline ''voided'' the contract on the $3,975 lot and presented to her a contract (duplicate originals), for the purchase of said west half of Block 1, and she signed them and gave him a check for $1,205, drawn on the Foreman National Bank and payable to the Realty Co.

This new contract (introduced in evidence) is on a similar printed form, dated September 19, 1925, and signed by the parties. The purchaser (plaintiff) agrees to pay to the vendor, for the ''west half of Block one (1)'' in Bartlett's Grand Estates subdivision, ''the sum of $7,250,—$2,000 cash, receipt of which is hereby acknowledged, $250 *by special allowance,* and

the balance, $5,000, in monthly instalments of $85, or more, on the 1st day of each and every month hereafter, commencing April 1, 1926, until 45 months from the date hereof, at which time the entire unpaid balance of said purchase price shall become due and payable." There is a similar provision as to the vendor "not having represented or promised that there will be a new line of transportation to Grand Estates," and a similar "subjoined" clause over plaintiff's signature, as follows:

"The undersigned has read and understands the whole of the above contract, and now states, and in consideration of the contract agrees, that no representation, promise or agreement not expressed in the contract has been made to induce the undersigned to enter into it."

Plaintiff further testified that on the morning of September 21, she telephoned the Foreman Bank and stopped payment on the $1,205 check; that when on Tuesday morning (September 22) Cline telephoned and asked why she had stopped payment on the check, she replied that she had done so "because I could not possibly think of taking *two* pieces of property on my shoulders"; that Cline called upon her at her home on that evening and stated that, even though payment on the $1,205 check has been stopped, "I can make trouble for you as you signed a contract"; that Cline again repeated his statements that the railroad company had contracted to furnish transportation facilities for the subdivisions within six months, etc., and further stated that she had been very foolish to stop payment on the check, etc.; that he showed her a letter which he had just received, signed by the Realty Co., dated September 22, 1925, and addressed to the "Sales Force on Grand Estates" (introduced in evidence) to the effect that "the present prices on Grand Estates are hereby recalled and that on and after this date new prices, of

practically 50 per cent higher than the present prices, will go into effect;'' that Cline again stated that the $5,750 lot, which she had purchased, "would be sold before the six months were up''; and that Cline induced her to "stay with the contract" as to said new parcel of land (W½ of Block 1), and to agree that she would meet him at defendant's Chicago office on the following morning, give him a new check for $1,205 and go ahead with the deal.

Plaintiff further testified that on the morning of September 23 she went to said office and gave Cline a new check for $1,205, for first payment on the Grand Estates property (West ½ of Block 1), and that the Realty Co. cashed the check; that for the next six months she paid to the Realty Co., by check, $75 each month for monthly payments on the contract for the lot in the North Shore Highlands subdivision (checks introduced in evidence); that during that period she made no monthly payments on the Grand Estates property—the first monthly payment not being due until April 1, 1926; that after she had delivered the sixth $75 check, dated March 15, 1926, she again called on Cline and he told her that the railroad had not yet been completed, or any progress made in its building, and that the North Shore Highlands lot had not yet been sold; that he further stated to her that "the railroad company has had trouble with workmen and been delayed," and suggested that she continue to make the monthly payments on both pieces of property and then see him again in a few months; that she made payments for the next three months (April, May and June) on both pieces of property—$75 each month on the North Shore Highlands lot and $100 each month on the Grand Estates parcel (checks introduced in evidence); that in July, 1926, she again called on Cline and stated that, although about nine months had passed there were "no signs of the railroad coming up there"

and that unless it soon was built she could not continue to pay on both pieces of property; that Cline replied that under the contract which defendant had with the railroad company it was bound to complete the road, but that just now it was having "a little trouble"; that Cline finally said that he would make the monthly payments smaller "until the railroad company completes its contract with us," that he would reduce those payments from $75 to $50 on the one lot and from $100 to $75 on the other parcel, making the aggregate payments to be made each month $125, and that plaintiff need not make any further payments "until about September 1, 1926"; and that subsequently on September 1, 1926, and during each of the succeeding months of October, November and December, 1926, she made payments by four checks payable to the Realty Co., each for $125, which checks were cashed (checks introduced in evidence).

In accordance with said conversation in July, 1926, two new contracts, dated July 16, 1926, and drafted on similar printed forms, were signed by the parties— one for the North Shore Highlands lot and the other for the Grand Estates parcel. Both were introduced in evidence. By the one, plaintiff, as purchaser, agreed to pay to defendant, as vendor, "$5,750,—*$1,825 by assignment of contract to Frederick H. Bartlett, Trustee,* for the purchase of the above described premises; and the balance, $3,925, in monthly instalments of $50, or more, on the 1st day of each and every month hereafter, *commencing September 1, 1926,* until 45 months from date hereof, at which time the entire unpaid balance of said purchase price shall become due and payable." The $1,825 mentioned is the aggregate of all cash payments made by plaintiff on the property up to and including the month of June, 1926. By the other contract plaintiff, as purchaser, agreed to pay to defendant, as vendor, "$7,250,—*$2,550 by assignment*

*of contract to Frederick H. Bartlett, Trustee,* for the purchase of the above described property; and the balance, $4,700, in monthly payments of $75, or more, on the 1st day of each and every month hereafter, commencing September 1, 1926, until 45 months from date hereof, at which time the entire unpaid balance of said purchase price shall become due and payable." The $2,550 mentioned is the aggregate of the $250 (allowance), the $2,000 (cash down payment), and cash monthly payments on the property of $100 for months of April, May and June, 1926. In both of the contracts is the clause that the "vendor has not represented or promised that there will be a new line of transportation" to the properties, etc., as in the former contracts, and also the same "subjoined" clause, signed by plaintiff.

Plaintiff further testified that during January, 1927, she again called on Cline and stated that, notwithstanding his promises and representations as to railroad transportation facilities, etc., the railroad had not yet been completed, or the lot in North Shore Highlands sold for her by defendant, and further monthly payments were maturing, etc.; that Cline replied that "our office has been in communication with the railroad company and they have said that when spring comes they will continue with their work, that until then just try and be patient, and that if the payments of $125 each month are too hard for you I will reduce them and make it a little easier for you"; that he then caused the two contracts to be rewritten so that on each contract she was to pay $25 on March 15, 1927, and $50 monthly thereafter *commencing April 1, 1927;* and that new contracts embodying the changes and dated January 20, 1927, were signed by the parties. These new contracts were introduced in evidence. They contain a "subjoined" clause, signed by plaintiff, and the clause that the "vendor has not repre-

sented or promised that there will be a new line of transportation" to the properties, etc. It is stated that in the one the "balance" due from plaintiff is $3,700, and in the other $4,375; and it is provided that plaintiff, after making such payment on March 15, is to pay on the 1st day of each and every month thereafter, commencing April 1, 1927, "monthly instalments of $50, or more, until 60 months from date hereof, at which time the entire unpaid balance of said purchase price shall become due and payable."

Plaintiff further testified that, in accordance with the provisions of these contracts, she made by check all required monthly payments up to and including the month of December, 1927, and also made two additional payments, aggregating $12.35, for "taxes." These checks, together with the receipts for the respective payments, signed by the Realty Co., were introduced in evidence.

Plaintiff further testified that, early in January, 1928, she again called on Cline, mentioned the numerous statements and representations made to her by him and Miss Rappeport as to railroad transportation facilities to the properties and as to Bartlett having made a contract with the railroad company for such facilities, and also Cline's statements that the Realty Co. would sell the North Shore Highlands lot for her so that she might thereby be enabled to pay the full purchase price on the Grand Estates parcel, and stated that although over two years had passed there was no sign of the railroad being built, that under the circumstances she could not continue making further payments, and that "you must do something about it"; that Cline replied: "I cannot; you signed those contracts"; that thereupon she said she had a check ready for $100 for the January, 1928, payments, but that under the circumstances she would not give it to him; that then she consulted an attorney; and that under

date of March 29, 1928, her attorney, Luther Swanstrom, wrote the Realty Co. a letter to which a reply was received under date of April 14, 1928.

Her attorney's letter is in the nature of a proposal for a settlement, with the suggestion that the Realty Co. "allow her to apply all the payments she has made on *one* contract and cancel the other." The Realty Co. refused to adopt the suggestion, and wrote that they had "nothing to offer, as we are not in a position to drop either one of the contracts," and that "we can do nothing further to help her." Five days afterwards defendant forwarded to plaintiff two written notices on printed forms, dated April 19, 1928, headed "*Owner's* five day notice of intention to cancel," and signed by "Fred'k H. Bartlett, trustee." In one notice, after referring to the contract of January 20, 1927, as to Lot 1 in North Shore Highlands, and stating that plaintiff has failed, "as of April 1, 1928," to make payments as agreed in the total amount of $252.24, plaintiff is notified that, unless said amount is paid "within five days from date hereof," defendant "will declare said contract forfeited and determined." In the other notice, as to the "West half of block 1" in Grand Estates, the amount due is stated to be $269.40.

Plaintiff further testified that in April, 1928, no railroad station had been built at Grand avenue and no railroad tracks laid adjacent to the subdivisions, and that there was no change as to other conditions of the right of way.

Cline admitted having conversations with plaintiff prior to the executions of the respective changed contracts (dated September 19, 1925, July 16, 1926, and January 20, 1927); admitted that he caused the contracts to be executed; but denied that at said conversations he made any such statements and representations to plaintiff, as testified by her, relative to railroad transportation facilities or Bartlett's contract

with the railroad company, or any agreement to sell for her said lot in North Shore Highlands.

William Hirschtke, plaintiff's witness, identified two maps of defendant's two subdivisions and the maps were introduced in evidence. He testified that in 1924, 1925 and 1926, and for a period of about three years, he was a real estate salesman in the employ of the Realty Co. and was familiar with the then values of lots and parcels of land in both subdivisions; that during those years he had many times been on the properties; that lot 7 in block 21 in North Shore Highlands is at the northeast corner (not northwest) of Green Bay road and Glen Flora avenue; that in 1925 there were no improvements in the subdivision; that it was "farm land," with no streets except the two State highways—Green Bay road and Grand avenue, and with no railroad facilities thereto nearer than Waukegan, which is three or four miles distant to the east; that the North Shore Electric Co. owned a right of way nearby, on which it had erected a number of towers for supplying light and power to North Shore towns; that the fair, reasonable market value in September, 1925, of said *northwest* corner lot (Lot 4, Block 25) in said North Shore Highlands subdivision was $1,000; that its value was "slightly less" than that of said *northeast* corner (Lot 7, Block 21); that, in his opinion, as to these valuations, "it would make no difference whether the property was sold on a cash basis or on a time payment plan"; that the fair, reasonable market value in September, 1925, of the west half of block 1 in the Grand Estates subdivision was "$800 an acre"; and that it was "farm land," with no streets laid out in the subdivision and with no improvements thereon; and that it was just north of Grand avenue, an east and west State highway.

Robert Bartlett, called as plaintiff's witness, testified that in 1925 he was and now is the general man-

ager of the Realty Co.; that he is the "second man" in charge of the business,—his brother, Frederick H. Bartlett, being "higher"; that he has been connected with the business, engaged in selling subdivision property, since 1901; that he has had charge of all contracts, which always are signed by his brother; that neither in 1925 nor at any time did the Realty Co., or Frederick H. Bartlett, individually or as trustee, have any contract with any railroad company for the establishment of any railroad in the immediate vicinity of either of the two subdivisions; that in his opinion the lots and parcels in the subdivisions would have "an increased value by transportation going in" if a railroad were built and established in "close proximity" to the subdivisions; and that he would consider four blocks as close proximity. Being asked if he had an opinion how much more valuable the particular lot and parcel of land involved would be if railroad transportation facilities were now in the immediate vicinity, he replied: "That is all speculative value of what it might be."

It is first contended by defendant's counsel that the judgment should be reversed because the evidence discloses that the false representations of Cline and Miss Rappeport, if made, were not made by them as agents of the defendant, Bartlett, but as agents of the Realty Co., and, hence, not binding on defendant. We cannot agree with the contention. Although the vendor in the contracts is "Frederick H. Bartlett, as trustee for the Frederick H. Bartlett Realty Co.," and the action is against him as such, we think that the evidence sufficiently shows that the contracts were his individual contracts, that he was the owner of the subdivisions in question, that he did business for convenience in the name of the Realty Co. (not incorporated), and said agents were in reality his agents. At the time the contracts of September 12 and September 19, 1925, were negotiated by Cline and signed by plaintiff, written re-

ceipts for the cash payments were signed by Cline and given to plaintiff. In the receipts is the clause that "this transaction is subject to the approval of *Frederick H. Bartlett,* and, if not approved, money to be refunded to the purchaser." And defendant individually signed these contracts, as well as the other substituted contracts, negotiated by Cline. And when these substituted contracts were executed the assignments of the former ones were made out to Bartlett individually. And on September 14, 1925, defendant individually signed and caused to be mailed a letter to plaintiff, in which he wrote in part: "The signed contracts for your property in North Shore Highlands have just passed through my hands. May I offer my sincere personal thanks for this substantial indication of your confidence in us and your faith in our judgment." Furthermore, the law takes no cognizance of any trust relation or trust estate. In *Wahl v. Schmidt,* 307 Ill. 331, 341, it is said: "An action against a trustee in his representative capacity is unknown to a court of law, for the law takes no cognizance of the trust relation or the trust estate. The trust estate can make no contract and commit no tort. If the trustee binds himself for the benefit of the trust estate the contract is his personal contract though he describes himself as trustee."

It is also contended that the false representations, if made, cannot be relied upon by plaintiff in the present action. It is argued that, because of the clause in all contracts (that plaintiff agrees that the vendor "has not represented or promised that there will be a new line of transportation" to the properties, etc.), and because of the so-called "subjoined" clause signed by her, she is precluded from maintaining the present or any action based upon said false representations. Under the evidence and the law we do not think there is any merit in the contention or argument. We believe

it to be well settled law that a party guilty of fraud cannot, by way of estoppel against the party injured, rely upon provisions in a contract similar to those contained in the present contracts. In the case of *Bridger v. Goldsmith,* 143 N. Y. 424, where somewhat similar provisions in a contract were relied upon as a defense to charges of false representations, the court said (p. 428):

"A mere device of the guilty party to a contract intended to shield himself from the results of his own fraud, practiced upon the other party, cannot well be elevated to the dignity and importance of an equitable estoppel. If the clause has any effect whatever, it must be as a promise or agreement on the part of the plaintiff, that however grossly he may have been deceived and defrauded by the defendant, he would never allege it against the transaction or complain of it, but would forever after hold his peace. It is difficult to conceive that such a clause could ever be suggested by a party to a contract, unless there was in his own mind at least a lingering doubt as to the honesty and integrity of his conduct. I assume that there is no authority that we are required to follow in support of the proposition that a party who has perpetrated a fraud upon his neighbor may, nevertheless, contract with him in the very instrument by means of which it was perpetrated, for immunity against its consequences, close his mouth from complaining of it and bind him never to seek redress. Public policy and morality are both ignored if such an agreement can be given effect in a court of justice. . . . Such a principle would in a short time break down every barrier which the law has erected against fraudulent dealing."

In *Edward Thompson Co. v. Schroeder,* 131 Minn. 125, 127–8, it is said:

"The order given by defendant was in writing and contained the clause: 'No representations or guaran-

ties have been made by the salesman on your behalf which are not herein expressed.' The writing makes no reference to the representations made the basis of the defense, and plaintiff contends: (1) That evidence of the representations was incompetent as varying the written contract; and (2) that the statement that no representations had been made by the salesman precludes defendant from showing to the contrary. Neither contention can be sustained. It is well settled by our decisions that parol evidence of fraudulent representations, not concerning a substantive part of the contract but made *to induce a party to enter into the same,* is admissible in evidence and has no tendency to vary the terms or provisions of the written contract. The purpose and effect of such evidence is to show that the contract was procured by fraud, not to change or modify the terms thereof, but to impeach its validity as a whole. . . . The point that defendant is precluded from showing fraud by reason of the clause in the contract, that no representations had been made except as stated in the contract, is disposed of by the case of *General Electric Co. v. O'Connell,* 118 Minn. 53, 57, where it is said: 'As to whether one who has, by fraud, been induced to execute a written contract, and to incorporate therein a statement that there are no other agreements or understandings between the parties, may recover damages therefor, *we have no doubt whatever.'*

"Such is the rule in this State and we discover no reason for departing therefrom. The clause in the contract, stating that no representations have been made save as set forth in the writing, should be construed to have reference to the subject matter of the contract and not to representations fraudulently made to induce and bring about its execution. If the contention made be sound, then it would follow logically that a written contract containing the clause 'this contract

was not procured by fraud,' would equally estop a defrauded party and render valid the contract, however gross the fraud may have been.''

See, also, in this connection the cases of *Antle v. Sexton,* 137 Ill. 410, 414–5; *Shepard v. Pabst,* 149 Wis. 35, 47; *Strand v. Griffith,* 97 Fed. 854, 857–8; *Jordan v. Nelson* (Iowa), 178 N. W. 544, 548.

Counsel also contend that plaintiff, by executing the contracts of July 16, 1926 and January 20, 1927, rescinded and canceled the prior contracts, which she charges were induced by false representations, and thereby she waived any right that she had to bring the present action based upon said representations. We cannot agree with the contention. The evidence does not disclose that the prior contracts of September 12 and September 19, 1925, or that of July 16, 1926, were rescinded or canceled, but that they were *assigned* by plaintiff in blank or to defendant individually. On the back of the prior contracts of September 12 and 19, 1925, is a printed form of an assignment filled in with ink handwriting and signed by plaintiff, as follows:

"Chicago, September 23, 1925

"For value received I hereby assign unto . . . . . . . . . . . . . . . . . . . . . address . . . . . . . . . . . . . . . . . . all interest in the within contract and in consideration of the consent of Fred'k H. Bartlett, Trustee, to the above assignment, I hereby guarantee performance of the within contract by the said assignee, and agree that Fred'k H. Bartlett, Trustee, in enforcing this contract, may proceed against me exactly as if I were principal, and without exhausting his remedies against the said assignee.

(Signed) Ruth G. Ginsburg (seal)''

On the back of the contract of July 16, 1926, is a similar assignment to ''Frederick H. Bartlett,'' signed by plaintiff and dated ''Jan. 20, 1927.'' It is apparent from the evidence that the execution of the successive

sets of contracts was occasioned by defendant's agreements to reduce the amounts of the monthly payments to be made by plaintiff, though not the total purchase prices for the properties. All were written out on similar printed forms, and none of the later ones is inconsistent with any former one. We think all should be construed together. In *Mayer v. Illinois Ins. Co.,* 211 Ill. App. 285, 291, it is said: "Where different instruments are executed between the same parties relating to the same subject matter, all of the instruments should be construed together in determining the real intention of the parties. . . . This is true whether the various instruments are executed at the same time or at different times." Furthermore, it appears from plaintiff's testimony that immediately prior to the times the contracts of July 16, 1926, and January 20, 1927, were negotiated by Cline, he again made to plaintiff false representations similar to those made prior to the execution of the contracts of September 12 and 19, 1925.

And we are unable to agree with counsels' further contention that "plaintiff has failed to show *any* damage resulting from the alleged misrepresentations." Plaintiff's witness, Hirschtke, testified that the fair market value in September, 1925, of the North Shore Highlands lot (northwest corner) was $1,000; that its then value was "slightly less" than that of the northeast corner lot; and that the then value of the west half of block 1 in the Grand Estate subdivision was "$800 an acre." Defendant introduced no evidence to contradict these valuations nor to show that the properties then were worth more. Robert Bartlett testified that, if railroad transportation were close enough to the subdivisions, land therein would have "an increased value by transportation going in," and that four blocks would be considered close. Plaintiff agreed to pay $5,750 for the North Shore Highlands lot and

$7,000 for the Grand Estates parcel (after reduction of $250, made when the contract of September 19, 1925, was executed), and up to January, 1928, she had made all required payments on the contracts, aggregating nearly $6,000. She then first definitely learned that the representations as to railroad facilities, etc., which had induced her to sign the contracts, were false, and she ceased making further payments and, through an attorney, and without success, endeavored to make a settlement with defendant. This was followed in April, 1928, by defendant giving written notice of his intention, if her payments were not continued, to cancel the contracts and forfeit all payments. As a result of her signing the contracts, induced by said false representations, she has lost not only the moneys she has paid (nearly $6,000), together with legal interest on the amounts, but we think she has suffered further damage. In *Schwitters v. Springer*, 236 Ill. 271, 274, it is said: ''In an action on the case for fraudulent representations in the sale of property the measure of damages is the difference between the value of the property as it is and what it would be worth if the representations had been true.'' (Citing *Antle v. Sexton*, 137 Ill. 410, 415–16; *Drew v. Beall*, 62 Ill. 164, 168.) As said in the *Antle* case, plaintiff was ''entitled to the benefit of her bargain,'' that is, the properties with the railroad facilities, etc., as represented. Although plaintiff did not introduce evidence showing definitely what would have been the respective values of the two properties, had the railroad been built and the railroad facilities afforded within the six months as represented, we think that under all the facts in evidence the jury's verdict of $9,000 was warranted and that the judgment should not be disturbed.

Counsel further contend that, inasmuch as no damages to plaintiff were proved as the result of the false representations as charged in amended count two, the

judgment must be reversed because of the court's refusal, on defendant's motion, to instruct the jury to return a verdict of not guilty as to that count. We see no merit in the contention. We think that the verdict and judgment can be sustained under the allegations of the count one, which is supported by the evidence. In *Klofski v. Railroad Supply Co.*, 235 Ill. 146, 149, it is said: ''Where a declaration consists of more than one count, and some of the counts fail to state a cause of action or are unsupported by any evidence fairly tending to prove them, it is proper practice for the trial court, when asked to do so, to withdraw such defective or unsupported counts from the consideration of the jury; but the refusal of the trial court to so withdraw such defective or unproven counts from the consideration of the jury is no reason for reversing the judgment when there are other proven counts in the declaration sufficient to sustain the verdict.''

Counsel further contend that the court erred in refusing to give to the jury certain instructions tendered by defendant and in giving certain other instructions offered by plaintiff. We have examined the several instructions referred to, in connection with all the given instructions, and do not think that any reversible error was committed by the court in the particulars urged. We think that the jury were sufficiently and fairly instructed.

Our conclusion is that the judgment appealed from should be affirmed and it is so ordered.

*Affirmed.*

SCANLAN, P. J., and KERNER, J., concur.