Sarah L. Pedalty, Appellee, v. George F. Nixon and Company et al., Appellant.

Gen. No. 38,671.

Opinion filed January 27, 1937.

SCHUYLER, WEINFELD & HENNESSY, of Chicago, for appellant; HENRY E. JACOBS, of Chicago, of counsel.

MARTIN S. GORDON and EDWARD R. NEWMANN, both of Chicago, for appellee.

MR. JUSTICE HALL delivered the opinion of the court.
By this appeal, defendant, George F. Nixon & Company, a corporation, seeks the reversal of a finding

and judgment against it and in favor of plaintiff entered on June 5th, 1935, for the sum of $16,997.64. The trial was by the court without a jury.

The action was brought on January 23, 1934, and by an amended complaint filed in the cause, it is charged, in substance, that on January 24, 1929, plaintiff entered into a written contract with defendant by the terms of which she agreed to purchase from defendant certain real estate situated in Cook county, Illinois, for the price of $35,000; that prior thereto and for the purpose of inducing the plaintiff to enter into the contract, the defendant, by its agents, represented to the plaintiff that the lots were of a value greatly in excess of $35,000; that it was the intention of the defendant to increase the purchase price of the lots to $40,000 within a short time after the date of the contract; that it would not be necessary for plaintiff to make all of the instalment payments for such property as should be provided by the contract proposed to be entered into between the parties; that if she purchased the property from the defendant, defendant would immediately resell the lots at a price in excess of the purchase price, and that the sale would be consummated by defendant for plaintiff before the first of the instalments should become due; that one G. W. Brown, who was the agent of the defendant in the negotiation of the proposed contract, represented to plaintiff that if plaintiff should enter into the contract, defendant then and at that time, had a purchaser for the lots in question at a price substantially higher than the price at which defendant was then willing to sell them to the plaintiff; that Brown, as agent for the defendant, represented and stated to the plaintiff that for certain business reasons, it was undesirable and impractical for the defendant to deal directly with this proposed purchaser, but that if plaintiff would purchase the lots from defendant, that defendant would conclude the sale of the lots to the third party at a substantially

higher price, and with material profit to the plaintiff, and that the entire transaction would take place prior to the payment of even the first monthly instalment proposed to be provided for in the contract of sale; that relying upon such promise, plaintiff was induced to enter into the contract of purchase. It is further alleged that the defendant failed and refused to sell the premises at a price in excess of $35,000 to the damage of the plaintiff in the sum of $12,856, with interest from the date of the contract, January 24, 1929.

Plaintiff alleges that the contract was thereupon entered into between the parties on January 24, 1929, and that by its terms, it provides for the sale by defendant to plaintiff of lots 25, 26, 27 and 28 in Block 4 in George F. Nixon & Company's Rapid Transit Park. It is further alleged that in this contract, the plaintiff agreed to pay defendant the sum of $35,000 for the lots mentioned, $7,000, to be paid on the date of the contract, and $350 or more on a certain day of each month thereafter, beginning with the first day of July, 1929, and to continue until the full amount was paid. The contract referred to contains, among other things, the following provisions:

"(1) Second party expressly represents to the first party that no representations of fact other than herein contained have been made or relied on by the second party, and that no representation or promise has been made to said second party by any person whosoever as to the transferability of this contract, or as to any waiver or any forfeiture that may hereafter accrue hereunder, or as to the purpose for which such lots can be used, or as to the character of the buildings that may be placed thereon, or by whom the same may be erected or built, or in relation to any other matter, cause or thing, except the use of said lots without any buildings thereon for such purposes as second party may see fit to use the same after requiring a deed of said premises.

"(2) It is expressly understood by the second party that the first party does not undertake or agree to resell for the second party the real estate herein described."

In addition to the contract entered into, plaintiff executed and delivered to defendant, the following document contemporaneously with the signing of the contract:

"First: We do not agree to return the customer's money or to resell his property.

"Second: We do not wish to sell our property to persons who do not buy it with the intention of paying for it in full. We do not offer our property as a speculation, though we do offer it in all confidence for homes, apartments, or business sites and as an investment of the highest class. In order for a real estate investment to be most profitable, the buyer should be able to hold on until the natural demand comes, which, in a community growing at the rate of Chicago and contiguous territory, is inevitable after a few years. We do not care to sell our property except to those who desire such property in a highly restricted district, or to those who will be able to hold it until an advantageous opportunity arises for a resale. Under proper conditions, we are confident that investments with us will prove remunerative and satisfactory, but we will not knowingly sell to non-income producers, who are dependent for a living upon the capital they propose to invest in land.

"This statement is to be signed by all customers, and is brought to their attention prior to signing our contract of sale, from the fact that, in a business as enormous as ours, misunderstandings may occur, which, without this warning, might lead purchasers into unwise investments.

"We want your business, but we want it under conditions which will insure permanent satisfaction to

both parties. A good friend who is not a customer means more to George F. Nixon & Company than a customer who is not a good friend. If we carefully call your attention to these conditions of sale before the contract is signed, we can justly expect the customer thereafter to live up to its reasonable provisions.

"Date and sign here                    Sarah E. Pedalty
"January 24th, 1929"

In this amended complaint, plaintiff further avers that as and for her first payment on account of such contract, she assigned to the defendant what she terms to be "an equity" in another piece of real estate, and that also at said time, she assigned and delivered to the defendant certain shares of stock valued on January 24, 1929, at a sum of $12,856, and that she has frequently demanded the return of her stock, but that defendant has refused to return the same, and has converted the stock to its own use.

The charge is made by plaintiff that the representations made to her that the defendant had a purchaser for the lots which she contracted to purchase, were false and fraudulent, and were made for the purpose of inducing plaintiff to part with her stocks and with her contract to purchase the certain other lot from defendant, and to enter into the contract to purchase the lots in question, and that, relying upon such false and fraudulent representations, she surrendered her stocks to the defendant, and that as stated, defendant converted the stocks to its own use.

The grounds for reversal urged by defendants are that a false representation, in order to constitute a cause of action for fraud and deceit, must be a representation as to an existing or past fact, and not a mere promise to do some act in the future; that a party who signs an instrument, relying upon representation as to its contents, when he has an opportunity to ascertain

the truth by reading and does not avail himself of the opportunity, cannot be held to say that he was deceived by misrepresentation; that an innocent vendor is not liable for an action for deceit brought for a fraudulent representation of his agents, and that plaintiff cannot recover because she did not ask for rescission, or offer to return the contract or equity in the lots, but on the contrary, by her act of transferring the lots to Krenn & Dato for the property, she treated the contract as valid.

Plaintiff testified to the effect that in January, 1929, she engaged in a conversation with a Miss Hazel Schulman regarding investments in real estate; that subsequently, Hazel Schulman became associated with the defendant corporation, and that she thereafter called upon the plaintiff and stated to plaintiff that Nixon & Company had real estate for sale in Niles Center Garden Subdivision, and requested plaintiff to look at some of the properties; that Miss Schulman stated to plaintiff that plaintiff could buy a lot for $7,500 and easily sell it for $9,000; that plaintiff could pay a small amount down and get a loan on certain stocks which she told Miss Schulman she owned; that subsequently Miss Schulman and a man named Brown, sales manager for the defendant company, took the plaintiff to Niles Center and showed plaintiff some lots; that plaintiff then told Brown that she had 160 shares of common U. S. Gypsum Co. stock, and 17 shares of preferred stock in the same company; that shortly thereafter she was again taken to Niles Center, and that Brown and Miss Schulman showed her a lot which was priced at $7,500; that plaintiff was then taken to the office of the defendant company at 4406 Broadway, Chicago, where she met a Mr. Harrell, who was manager of that office; that Harrell drew a contract for the sale to plaintiff of a lot at the price of $7,500, and that plaintiff signed a contract and gave Brown the shares

of stock referred to; that she then signed a statement dated January 14, 1929, addressed to George F. Nixon & Company, wherein it is recited that she placed 60 shares of stock with the defendant company and authorized Nixon & Company to secure a loan upon the stock for a sufficient amount to make the down payment on lot No. 10 in Niles Center Gardens "which I am today purchasing from you at $7,500"; that thereafter she entered into a contract with Miss Schulman, by which she gave Miss Schulman the sole and exclusive right to sell the lot in question for $9,000. The record indicates that on January 15, 1929, the plaintiff executed a note for $1,950 payable to the order of E. C. Harrell, and that she deposited with him collateral for the payment of this note, the shares of stock before referred to. The record also indicates that E. C. Harrell, the person referred to, died prior to the date of the trial. Plaintiff further testified that thereafter, at the request of Harrell, she signed another note at the Sheridan Trust Bank, and that Harrell returned to her the note above referred to. The last note executed by plaintiff, at the request of Harrell, was made payable to the Sheridan Bank & Trust Company. This witness further testified, in effect, that thereafter and on January 24, 1929, and after the transaction hereinbefore referred to had been completed, Brown called on her and told her that if she would purchase a certain corner lot for $35,000, that he Brown, had an immediate purchaser for the lot for the sum of $41,000, that the Sun Oil Company had made "us," meaning Nixon & Company, an offer of $41,000 for the lot in question, but that Nixon & Company did not desire to sell the lot direct to the oil company because "people wouldn't like it," but that if the deal could go through plaintiff, she, plaintiff, could make a profit of $6,000 on the deal, and that Brown agreed to finance the proposed purchase through the use of her oil stocks and

the lot she had already contracted to purchase. Thereafter, on the same day, to wit: January 24th, 1929, plaintiff executed the following document:

"George F. Nixon & Company
Realtor Area Developers
Chicago    Nixon Building
S. W. Corner Clark & Monroe
Private Branch Exchange
Randolph 0344

George F. Nixon & Company,
105 West Monroe Street,
Chicago, Illinois
Gentlemen:

"I am herewith delivering to you One Hundred (100) shares of United States Gypsum Company common and seventeen (17) shares of the preferred stock and to obtain sufficient loan on the balance of the common to make the full down payment on Lots 25, 26, 27 and 28 in Block 4—Rapid Transit Park, which I have this date purchased from you.

"Signed *Sarah E. Pedalty*
"Sarah E. Pedalty.

"Stock Received:
*E. C. Harrell*
Director of Sales
North Shore Properties"

Plaintiff also testified that on January 25, 1929, she executed a note payable to the order of E. C. Harrell for $2,200 and pledged as collateral for the payment of the same, 55 shares of U. S. Gypsum common stock. Plaintiff testified that she went to the First National Bank, got her stocks, and turned them over to defendant; that after she had signed the contract involved here, which is, in substance, the same as is recited in the amended complaint filed in this cause, she frequently asked Brown to give her a contract to sell the

lots, as he had agreed to do, but that he evaded her; that she then spoke to Mr. Nixon and Mr. Loriber, Mr. Loriber being connected with Nixon's office, about the matter, and told them about Brown's promise to sell the lots, as already suggested; that thereafter Brown called upon the plaintiff and requested her to give him more time, and that he would sell the lots and get her stock back; that during the controversy between the plaintiff and the members of the defendant company, Brown met her and told her that he was having difficulties with his employer over the matter; that subsequently, she called at the office of Nixon & Company, and was there informed by an office girl that Brown had been discharged, and that he had been caught in some bad deals. Plaintiff's further testimony is to the effect that at the time Brown made his proposition to her to buy the lots in question, which he proposed to sell for her to the Sun Oil Company, she and Brown made certain memoranda on a slip of paper which she retained, and which on the trial, was offered and received in evidence. From her testimony, it is shown that Brown there noted the figures "41,000," which she testified was the amount she was to get for this lot in case she purchased it at the price of $35,000. Other figures appear on this document, which, she stated, indicate that plaintiff was to pay $15,000 as a down payment on the purchase of the lot. This document also contains the following: "Balance of the payments through me to Nixon & Co. so Nixon a realtor will not be blamed for oil station there." Plaintiff testified to the effect that these last words were placed on this document by her as her memoranda, and were made by her in the presence of Brown, and that at this time, he, Brown, wrote on the document the figures "41,000," as indicating the price which she would get for the lot if she completed the deal. Plaintiff further testified that shortly after she

had her conversation with Brown about the proposed purchase of the lot and the resale to the Sun Oil Company, she was called on the telephone by someone purporting to represent the Sun Oil Company, who wanted to know if he could buy the lot for $45,000, and that the witness told this person that he could; that she reported this conversation to Brown, and insisted that the deal be closed, and that she afterwards reported the conversation with this person to Mr. Nixon of the defendant company "quite a long time after the deal was closed."

On cross-examination the plaintiff was asked whether she remembered that Mr. Hackett of the Nixon Company had called her up concerning the contract and her failure to make payments as agreed, to which she replied that she did not remember. She also testified that she made a deal with another firm for another lot of much less value, by which the contract of Nixon & Company was taken over as part payment, but that she lost this lot and everything else.

Herbert J. Loriber, vice president of the defendant company, testified that at the time of the delivery of the agreement of January 24, 1929, to plaintiff, the salesman Brown was present, and that he, Loriber, read and explained to plaintiff the two documents executed by her, and asked plaintiff if she fully understood the contract, what the transaction was, and whether or not she could make the payments provided for in the contract, and that plaintiff signified to Loriber that she was in a position to make such payments, and that thereupon Loriber delivered the agreement to her. He also testified that because plaintiff had defaulted in payments on the contract commencing with the payment agreed to be made on July 1st, 1929, she was notified by defendant of such default both by letters and by telephone. Plaintiff does not take issue with the testimony of Loriber.

George F. Nixon, president of the defendant company, testified in substance that he had had no conversation with the plaintiff as testified to by her, and that ''as a matter of fact, I have no recollection of ever having seen Mrs. Pedalty until today.''

Brown was not produced as a witness. There is nothing in the record to suggest that Brown did not make the representations to plaintiff, as alleged and testified to by her, in order to induce her to part with her stocks and to buy the lots in question. It is not denied that Brown was the agent of the defendant in the transaction. Defendant takes the position that a false representation in order to constitute a cause of action for fraud and deceit, must be a representation as to an existing or past fact, and not a mere promise to do some act in the future. It is in evidence, and not disputed, that Brown told plaintiff that if she would purchase these lots, he *then,* at that instant, had a purchaser for the lots from her at a price of $6,000 over and above the price which she agreed to pay for the lots which she agreed to purchase, and that Brown's statement was false and untrue.

The principal points suggested by defendant as grounds for reversal, have been passed upon by both the Appellate and Supreme Courts. In *Ginsburg v. Bartlett,* 262 Ill. App. 14, an action was brought against the Frederick H. Bartlett Realty Company by a woman, who alleged that the realty company had represented to her at the time she had made a contract with the defendant company for the purchase of certain lots, that ''railroad transportation facilities were then being established, that a railroad company was the owner of the right of way adjoining the subdivisions, and that a contract had been entered into between the railroad company and Frederick H. Bartlett Realty Company wherein and whereby the railroad company agreed that within a short period of time

complete railroad transportation would be maintained upon the tracks then being laid.'' In that case, as stated in the court's opinion, the contract between the parties contained the following provisions:

"Purchaser further agrees that the vendor *has not represented or promised that there will be a new line of transportation to North Shore Highlands,* notwithstanding the fact that it is generally understood that a public service corporation is the owner of a right of way through the said subdivision, it being now stated by the vendor that there may never be a new line of transportation on said right of way, and it is further agreed that a new line of transportation is not a part of the consideration of this contract.''

"The undersigned purchaser has read and understands the whole of the above contract, and, in consideration of the sale and vendor affixing his signature, *expressly agrees that no misrepresentations regarding the property have been made to him by any vendor's agents or salesmen,* and *releases any right or claim* he might have by reason of any misrepresentation if made by any such agent or salesman, and expressly states that no representation, promise or agreement not expressed in the contract has been made to induce him to enter into it.''

The railroad was never built, and plaintiff sued to recover her money. In the case cited, as in the case at bar, the representations were made by the agent of the company. In the case cited, the provisions in the contract between the parties and statement signed by plaintiff in that case, are very similar to the statements signed by plaintiff in the contract signed by her in the instant case. In the *Ginsburg* case, this court cites, with approval, the case of *Bridger v. Goldsmith,* 143 N. Y. 424, where there were provisions in a contract similar to those contained in the contract in the

case at bar, and in the *Ginsburg* case. In the *Bridger* case, the New York court said:

" 'A mere device of the guilty party to a contract intended to shield himself from the results of his own fraud, practiced upon the other party, cannot well be elevated to the dignity and importance of an equitable estoppel. If the clause has any effect whatever, it must be as a promise or agreement on the part of the plaintiff, that however grossly he may have been deceived and defrauded by the defendant, he would never allege it against the transaction or complain of it, but would forever after hold his peace. It is difficult to conceive that such a clause could ever be suggested by a party to a contract, unless there was in his own mind at least a lingering doubt as to the honesty and integrity of his conduct. I assume that there is no authority that we are required to follow in support of the proposition that a party who has perpetrated a fraud upon his neighbor may, nevertheless, contract with him in the very instrument by means of which it was perpetrated, for immunity against its consequences, close his mouth from complaining of it and bind him never to seek redress. Public policy and morality are both ignored if such an agreement can be given effect in a court of justice. . . . Such a principle would in a short time break down every barrier which the law has erected against fraudulent dealing.' " In the *Ginsburg* case, as here, the action was for fraud and deceit, and this court affirmed a judgment in favor of plaintiff.

As stated, one of the points made by defendant in the case at bar is that the plaintiff cannot recover because she did not ask for a rescission of the contract, nor offer to return the contract or her equity in the lots, but that on the contrary, by transferring her interest in the lots to Krenn & Dato for other property, she treated the contract as valid. In reply to this,

plaintiff's counsel asserts that it was not necessary for plaintiff to ask for a rescission of the contract in order to maintain her action for damages, based on a charge of fraud and deceit. Plaintiff's counsel cites no authority to support his contention. In support of its contention, defendant cites a number of cases, none of which is in point. We are of the opinion that defendant's contention is without merit, and that plaintiff's counsel correctly states the law.

In *Siltz v. Springer,* 236 Ill. 276, not appearing in either brief, plaintiff charged that he had been induced by fraud to purchase certain worthless notes. The court there held that the plaintiff might retain the notes and sue in an action for fraud and recover the difference between the true value of the notes and what they were represented to him to be worth, and that the action was not barred because he did not have the notes in his possession at the time of the trial, and did not offer to return them. The books are replete with authority supporting the doctrine there stated. In the case at bar, however, there is no showing whatever as to the value, if any, of the property plaintiff acquired from Krenn & Dato, for which she testified she exchanged the contract with the defendant in this case. She does say that she lost everything, possibly, intending to include this property in what she lost. This statement is not sufficient to justify the finding and judgment.

The cause is reversed and remanded for a new trial.

*Reversed and remanded for a new trial.*

DENIS E. SULLIVAN, P. J., and HEBEL, J., concur.